# YOPPS *v.* STATE

[No. 239, September Term, 1963.]

*Decided March 18, 1964.*

The cause was argued before BRUNE, C. J., and HAMMOND, PRESCOTT, MARBURY and SYBERT, JJ.

*Morris Lee Kaplan,* for appellant.

*Russell R. Reno, Jr., Assistant Attorney General,* with whom were *Thomas B. Finan, Attorney General, William J. O'Donnell, State's Attorney,* and *Charles E. Moylan, Jr., Deputy State's Attorney,* on the brief, for appellee.

MARBURY, J., delivered the opinion of the Court.

The appellant was tried and convicted of burglary in 1961. On appeal from that conviction we reversed, *Yopps v. State,* 228 Md. 204, 178 A. 2d 879, for the sole reason that defense counsel was not given an opportunity to argue before the verdict was announced. A new trial was held before Judge So-

daro and a jury on February 20, 1963 and the defendant-appellant was again convicted of breaking a dwelling house with intent to steal, in violation of Code (1957), Article 27, Section 32, and sentenced to ten years in the Maryland Penitentiary.

At approximately 4:45 p. m., on Sunday, February 12, 1961 Mr. John O'Grady and his family departed from their securely locked home at 2237 Lake Avenue in Baltimore City to visit Mrs. O'Grady's parents. When the O'Gradys returned about 7:00 p.m. that evening it was noticed that the front door had been forced, and upon entering, the O'Gradys found that the house had been ransacked. Household items, including silverware, candlesticks, a camera and numerous items of jewelry, of a total value of about $1200 were missing. Mr. O'Grady also found that the back door of the house was unlocked, and he discovered fresh footprints in the snow in the backyard leading from the house to an alley beyond. Mr. O'Grady's testimony also adduced that all of the missing items could have been carried by one man, and that he had a sign reading "John F. O'Grady, Attorney-at-Law" affixed to the right of the front door of his house.

The State produced as a witness Mrs. Thelma Frisbie, who lived across the street from the O'Gradys. She testified that at approximately 5:30 p.m. on the afternoon in question the appellant came to her door and asked her if she knew where a "Mr. Pizza" lived on Lake Avenue. Having lived there for some thirty-five years, Mrs. Frisbie advised Yopps that there was nobody by the name of Pizza living on that street. Mrs. Frisbie testified further that because the appellant had acted very nervously and excitedly she continued to observe him. She saw him go to the house next door and to the home of Dr. Rider across the street and one house removed from the O'Grady house. She also observed Yopps standing at the front door of the O'Grady house for two or three minutes with the storm door open. She saw him walking around the block at a hurried pace and then driving down the street in a car which she had previously noticed parked on Lake Avenue some distance away. Yopps stopped the car in front of her house, he and another man got out, crossed the street and they both went up the front steps of the O'Grady house.

The next door neighbor of the O'Gradys, a Mrs. Bessie Faraclas, testified that between 5:15 and 5:40 p.m. on February 12 she left her house by the front door, and just as she stepped onto her porch she saw the appellant standing at the front door of the O'Gradys. At that moment he tipped his hat and she heard him say, "Good-bye Mrs. O'Grady." She further testified that Yopps went down the sidewalk toward a car, putting his hands in his pockets as if searching for a key.

Dr. Rider was called to testify for the State, and he corroborated the observation of Mrs. Frisbie by stating that while he was eating supper appellant rang his doorbell and speaking "in an excited manner," inquired as to the whereabouts of a Mr. Pizza. He testified that the appellant's demeanor aroused his curiosity, that after he and his wife had finished their meal he looked outside and observed Yopps walking down the steps and sidewalk from the O'Grady house fumbling in his pockets, that he arrived at an automobile, touched the handle, but continued to reach in his pocket, and then turned away and went down the street and around the corner.

The last of Mr. O'Grady's neighbors to testify was a Dr. Joseph, who lived two doors from the O'Gradys on the same side of the street. He stated that while it was still light, some time between 5:15 and 5:30 p.m., he was in front of his house cleaning snow off his car when appellant and another man drove up in a car, parked it on the opposite side of the street, got out and crossed the street and, so he observed, entered the O'Grady house. A little later he saw the two men come out of the alley and cross Lake Avenue to the car which was parked just below Mrs. Frisbie's house.

The arresting officer testified that although Yopps admitted being in the block inquiring about Mr. Pizza, he denied being on the side of the street where the O'Grady house is located. When advised by the officer that the police had information contrary to his disavowal, Yopps refused to say anything more. The police officer further testified that all of the neighbors later identified Yopps at a police lineup, and this was corroborated by their own testimony.

On his behalf, the appellant took the stand and admitted his presence on Lake Avenue, but he maintained that he was simply

inquiring as to the whereabouts of Mr. Pizza. In fact, he admitted having gone up to the O'Grady front door, but explained that he had seen the "G" on the sign next to the front door and thought Congressman Garmatz lived there, but upon reaching the front porch he saw the word "O'Grady", turned and left. He denied having acted as the witnesses have generally described his activities. In substance he claimed that he was in the neighborhood in order to locate Pizza whom he claimed was endeavoring to sell a place of business. The companion that Dr. Joseph recalled having seen was, testified Yopps, his friend Nick Poppolis, who was interested in buying the business. On cross-examination, appellant admitted to a lengthy criminal record. He stated that he had met Poppolis while they served together in the Merchant Marine during the Second World War and that he had not seen him since 1952 until the day in question. The appellant called no witnesses to corroborate his version of his activities on Lake Avenue.

Appellant was convicted on the first count of an indictment under Code (1957), Article 27, Section 32, of the crime of breaking a dwelling house in the daytime with intent to steal personal goods of another which are located therein. With respect to the breaking and entry element, the evidence, if believed by the triers of fact, was that the appellant together with another entered the O'Grady house some time shortly after 5:00 p.m. on February 12, 1961. Dr. Joseph's unequivocal testimony was that the entry occurred and that it was in the daytime hours. There was also sufficient testimony that his entry was not permissive. Mr. O'Grady testified that the door had been locked upon his departure and that when he returned home he found it had been "jimmied." In addition there is the testimony of the neighbor across the street that prior to his entry, appellant stood at the door for a time during which the door could have been forced. The jury properly could have inferred that Yopps was surprised during the course of his attempt to break in the house by the emergence from her house of the next door neighbor, Mrs. Faraclas, and that to avoid suspicion he said, "Good-bye, Mrs. O'Grady" at a time when she was not at home.

Finding the requisite intent to steal is, of course, never a precise process for intent is subjective, and it must therefore

be inferred from the circumstances of the case if it is found at all. *Irving v. State,* 230 Md. 364, 187 A. 2d 313, and cases cited. We stated in *Felkner v. State,* 218 Md. 300, 307, 146 A. 2d 424, that the most conclusive evidence of the intent is the larceny itself. It is true that the missing articles had not been recovered at the time of the trial. There is, however, no denial that the larceny occurred at the time the appellant was in the vicinity. That fact alone is insufficient to convict Yopps, but when coupled with other suspicious circumstances may be enough to base a conviction upon circumstantial evidence. *Tasco v. State,* 223 Md. 503, 165 A. 2d 456. In addition to his presence at the scene of the crime, are the footprints in the snow, and the compelling fact that the robbery occurred during the time the appellant and his companion were the only persons seen by eyewitnesses to be on the O'Grady premises. From the act of going from house to house ringing doorbells it might be inferred that he hoped to find some house unoccupied for the purpose of burglarizing it. The appellant's own testimony was riddled by the contradictions of the neighbors and his alibi was uncorroborated. The jury was not required to believe the appellant's version of what took place and had sufficient evidence upon which to convict him.

Beside the challenge to the sufficiency of the evidence the appellant, through his court-appointed counsel, seeks to upset his second conviction because the trial court refused his motion to have the jury questioned as to whether any members of the panel of jurors or his or her family had had a house burglarized. We find no merit in this contention. Appellant made no request for *voir dire* examination until after he had stated that the jury was acceptable, and it is well established that the whole purpose of the inquiry is to ascertain the existence of cause for disqualification. *Goldstein v. State,* 220 Md. 39, 150 A. 2d 900. Aside from this, it is our view that the question which appellant sought to have propounded to the jury did not relate to a cause of disqualification under the circumstances. A question similar in nature to the one here was discussed in *Goldstein, supra.* One of several questions there which the trial judge had refused to ask the panel over the objection of counsel for the defendant (who had been chief of the Rackets Di-

vision of the Baltimore City Police) was whether they had had any personal experience with the Rackets Division and whether any member of their families had ever been involved in a raid or arrest by that division. We held that any prior experience of the jurors or their families with the Rackets Division would not necessarily disqualify them. As recently as the case of *Grogg v. State*, 231 Md. 530, 191 A. 2d 435, we reaffirmed that in this State the extent of examination of prospective jurors rests within the sound discretion of the trial court. There is no showing of prejudice to the appellant here, and under the circumstances we think the trial court did not abuse its discretion in refusing to propound the question.

Yopps himself filed with the clerk of this Court a "supplement" to his brief. In it he contended that the lower court was in error in denying his petition for a change of venue. None of the reasons assigned in support of this claim has any merit, and the lower court unquestionably did not abuse its discretion in denying his petition.

*Judgment affirmed.*