STATE OF MARYLAND *v.* CONSTANCE JOSIE GRAZIANO, GRACE SARA RYKIEL, EDWARD JOSEPH RYKIEL, LAURA CATHERINE POR-TERA, COSIMO (NMN) PORTERA, GOLDIE SCHULMAN, DANIEL SCHULMAN, VINCENT JOSEPH LAMARTINA, M I C H A E L ANGELO GRAZIANO, PAUL FRANK SCHULMAN AND SAM SANTO ALASCIO

[No. 289, September Term, 1972.]

*Decided March 9, 1973.*

The cause was argued before ORTH, C. J., and THOMPSON and DAVIDSON, JJ.

*Clarence W. Sharp, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Samuel A. Green, Jr., State's Attorney for Baltimore County,* and *Stuart E. Hirsch, Assistant State's Attorney for Baltimore County,* on the brief, for appellant.

*W. Lee Harrison* and *Cooper C. Graham* for Vincent Joseph Lamartina, Paul Frank Schulman and Sam Santo Alascio; *Stephen L. Miles* for Grace Sara Rykiel, Edward Joseph Rykiel, Laura Catherine Portera, Cosimo Portera, Constance Josie Graziano, Goldie Schulman, Daniel Schulman and Michael Angelo Graziano, with whom were *Russell J. White, Michael J. Lambros, Frank B. Cahn, II* and *Thomas L. Hennessey* on the brief, for appellees.

ORTH, C. J., delivered the opinion of the Court.

SAM SANTO ALASCIO, C O N S T A N C E JOSIE GRAZIANO, MICHAEL ANGELO G R A Z I A N O, COSIMO PORTERA, LAURA CATHERINE POR-TERA, EDWARD JOSEPH RYKIEL, GRACE SARA

RYKIEL, DANIEL SCHULMAN, VINCENT JOSEPH LAMARTINA, GOLDIE S C H U L M A N and PAUL FRANK SCHULMAN, appellees, were charged with various violations of the gambling laws of Maryland as presented in indictments numbered 41493, 41495, 41498, 41500, 41501, and 41502 returned by the Grand Jury for Baltimore County on 26 April 1971. All the evidence which could be adduced by the State to prove the charges derived from the interception of telephone communications. The interception was authorized by an order of 18 December 1970 of the Circuit Court for Baltimore County. The order was issued upon the sworn petition of the States Attorney of Baltimore County supported by the affidavit of the Special Services Unit, Maryland State Police, pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Code, Art. 27, § 125 A, and Code, Art. 35, § 92-99. Appellees filed pretrial motions to suppress the evidence and to dismiss the indictments. On 14 April 1972, upon hearing, both motions were granted. The State appealed from the order dismissing the indictments. See Code, Art. 5, § 14; *State v. Simms,* 13 Md. App. 203; *State v. Hunter,* 10 Md. App. 300.

We have found that a judicially approved interception of communications is constitutionally permissible if issued and conducted under the rigid controls of the Fourth Amendment to the Constitution of the United States. Conversation is within the ambit of Fourth Amendment protection and the use of electronic and wiretapping devices to intercept it is a search within the meaning of that Amendment. *State v. Siegel,* 13 Md. App. 444, 449, aff'd, 266 Md. 256. The Fourth Amendment proscribes the issuance of any warrant ". . . but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The action of the court below was predicated upon its finding that there was not sufficient probable cause for the issuance of the order, and, therefore, the order was invalid as violating the constitutional

prohibition. The State claims that the court was wrong in this judgment; appellees urge that it was right.

It has been firmly established in this State that the court's consideration of the showing of probable cause must be confined to the affidavit alone. No evidence may be received outside the four corners of the affidavit either to show the existence of probable cause or to controvert the truth of the allegations therein. *Scarborough v. State,* 3 Md. App. 208, 211-212.

The affidavit here stated that the affiant, a police officer for 20 years, was regularly assigned to investigate violations of the laws regulating gambling within Maryland. He had participated in hundreds of such investigations, including those pertaining to lottery, and had made many arrests throughout the State for such violations. Early in December 1970 he received information from two confidential informants. Informant #1 had "on several occasions" furnished affiant "with information concerning violations of the lottery laws in this State, which led directly to the arrest and conviction of no less than eight (8) such persons for said violations . . ." What Informant #1 told affiant was set out in the affidavit:

> "[T]he said informant had made 'connections' with certain members of a lottery ring which enabled the said informant to place lottery wagers via telephone with a certain unidentified female known to the informant only by a certain code number consisting of a certain combination of two digits; that the said informant had sought these 'connections' at the request and direction of your affiant, and had placed lottery wagers, as aforesaid, at the direction of your affiant; that the said informant advised your affiant the method of operation insisted upon by the 'connection' requires that the informant be at a certain telephone at a certain pre-arranged time each day, except Sun-

280

day, to receive a telephone call for the purpose
of placing lottery wagers with the caller; the
informant further advised that both the 'con-
nections' and the unidentified female who
initiates the telephone call, as aforesaid, have
refused to provide the said informant with a
telephone number which would enable the in-
formant to initiate the telephone call and place
the wagers, as aforesaid, and that the unidenti-
fied female advised the said informant it would
be necessary that the informant be available to
receive the telephone call at the specified time
because she had many such calls to make and
could not call back; . . ."

Affiant directed Informant #1 to continue placing the
wagers. About ten days later Informant #1 told affiant
that he had played the numbers daily, except Sunday, un-
der the same procedures and that the female caller, iden-
tifying herself by the code, was the same person each day.

During the ten day period in which Informant #1 was
placing wagers as directed, affiant got in touch with In-
formant #2. The affidavit stated the basis of his re-
liability: ". . . Informant #2 has given your affiant
information in the past concerning gambling violations
which has proven to be accurate and correct . . ." The
affidavit set out what Informant #2 told affiant:

"[L]ottery wagers were then being accepted
via telephone numbers 655-3024 in the Balti-
more, Maryland area; that Informant #2 ad-
vised your affiant the person accepting these
wagers is a female who identifies herself only by
a code number consisting of a certain combina-
tion of two digits; that your affiant was advised
Informant #2 could not place such lottery
wagers personally but had observed a 'friend'
dial telephone number 655-3024, and said Infor-
mant #2 had continued to observe as the 'friend'
read from a list of lottery numbers and con-

comitant wagers to the recipient of the telephone call; that Informant #2 was advised by the 'friend' that the recipient of the wagers was a female who used a certain code number consisting of a certain combination of two digits; . . ."

Affiant observed that the identification code used by Informant #1 to place lottery wagers with an unknown female was the same identification code described by the friend of Informant #2 as used for identification by a female recipient of lottery wagers over telephone number 655-3024. Affiant also noted that the time when Informant #1 received the telephone calls and the friend of Informant #2 made them was "the time of day when lottery numbers and wagers are usually accepted by illicit operators of the scheme."

In view of the information received from the two informants, affiant determined from the telephone company that number 655-3024 was listed in the name of Edward J. Rykiel, 6 Oxyoke Court, Randallstown, Baltimore County, Maryland, and that 655-3310 was an auxiliary line working in conjunction therewith. Number 655-3024 was installed on 3 August 1968 and number 655-3310 was installed 12 August 1968. Both numbers were operational and in service "as of December 16, 1970." Affiant also ascertained from the State Department of Assessments and Taxation that 6 Oxyoke Court, Randallstown, Baltimore County, Maryland was owned by Edward J. Rykiel and Grace B. Rykiel. Thereafter, "on several occasions," affiant "established surveillance" on 6 Oxyoke Court. He observed "no unusual traffic in and out of the house and nothing which could be related to the operation of a lottery."

Affiant made several averments based on his "knowledge, experience and information received from Informants #1 and #2":

1) that there is probable cause to believe and he does believe that the lottery laws were being

282

violated by Edward J. Rykiel, and Grace S. Rykiel and others unknown in 6 Oxyoke Court and that telephones with number 655-3024 and number 655-3110 were being used in connection therewith;

2) that the use of telephones is a routine practice in the conduct of illicit lottery operations and that most lottery wagers placed by telephone were placed between the hours of 11:00 A.M. and 2:00 P.M., that the wagers described by the informants were placed between those hours, and that the "particular stage of the operation" carried on in 6 Oxyoke Court was referred to as a lottery "drop" or "turn in station";

3) that telephones in a "drop" or "turn in station" are used after the deadline for receiving wagers to communicate with the "bank" or "country house" of the lottery operation and even after the winning number for the day has been determined, usually about 5:00 P.M., to notify certain primary lottery writers of the winning number and inform them if they have a "hit" or winning combination on their lottery book;

4) that he believes that "no other investigatory procedures" would be reasonably likely to directly demonstrate the participation by the Rykiels and others because all communications between those involved "are likely to be by means of telephonic communications over the aforesaid telephone lines and only rarely by any other means."

Even if the credibility of Informant #1 and the reliability of his information are deemed to be sufficiently shown in the affidavit, see *Moore v. State,* 13 Md. App. 711, 718, it is clear, and appellant so concedes, that the information furnished by him was not enough, standing alone, to

support the issuance of the order. Nothing he said showed the probability that an illegal lottery operation was being conducted in 6 Oxyoke Court, over the telephone lines sought to be tapped, or by the Rykiels. The connection between the operation as described by Informant #1 and the telephones sought to be tapped was supplied by Informant #2. But the credibility of Informant #2 was not shown in the affidavit—the statement that Informant #2 had supplied "information in the past concerning gambling violations which has proven to be accurate and correct" is simply not enough. Id. Furthermore, although Informant #2 observed a "friend" dial telephone number 655-3024 and heard him read from a list of numbers and "concomitant wagers", that the person on the other end of the line was "a female who used a certain code number consisting of a certain combination of two digits" came only from this "friend". Neither the credibility of this "friend" nor the reliability of his information was shown in the affidavit. Therefore, the only indication of a connection between the telephone number and the illicit activities was from an unknown "friend", whose credibility was not established, through an informant whose credibility was not established. The personal activities of affiant were not sufficient to show that the information furnished by Informant #2 and the "friend" was reliable. Affiant merely ascertained to whom the telephone number was listed, where the telephone was located and that the premises in which the telephone was located was owned by the Rykiels. Surveillance by the affiant of the premises disclosed nothing "which could be related to the operation of a lottery." It follows that the averments of affiant may not be used to establish probable cause because they were predicated upon the information given by the informants. The extrinsic route to the establishment of veracity was not travelled in the affidavit here.

On our independent constitutional appraisal we find that the order was invalid for the reason that the affidavit supporting it did not show probable cause for its issu-

284

ance. See *Hudson v. State*, 16 Md. App. 49; *Dawson v. State*, 14 Md. App. 18; *Dawson v. State*, 11 Md. App. 694; *Moore v. State, supra; Iannone v. State*, 10 Md. App. 81; *Bolesta v. State*, 9 Md. App. 408. We hold that the court below did not err in granting the motion to dismiss the indictments.[1]

> *Order dated 14 April 1972 of the Circuit Court for Baltimore County affirmed; costs to be paid by Baltimore County, Maryland.*

---

1. In view of our holding we do not consider the grant of the motion to suppress the evidence. The State had no right to appeal from the granting of this motion. *State v. Siegel, supra*, at 471. But see note 28 therein.